# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

TAMMY APPLEGATE,                                    :

            Plaintiff,                              :

                                           Case No. 3:10CV0310

  vs.                                             :

                                           District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                                  :     Magistrate Judge Sharon L. Ovington
    Commissioner of the Social
    Security Administration,                        :

            Defendant.                            :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.   <u>Introduction</u>

Plaintiff Tammy Applegate sought financial assistance from the Social
Security Administration by applying for Supplemental Security Income ["SSI"]
on January 24, 2003, claiming disability due to chronic facial pain, chronic
obstructive pulmonary disease ["COPD"], emphysema, depression, and status
post triple bypass surgery.  (Tr. 81-85, 102).  Her application was denied during
the initial administrative proceedings.  She then was provided a hearing before
Administrative Law Judge ["ALJ"] Daniel R. Shell.  (Tr. 696-728).  On July 26,

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

2006, the ALJ issued a decision concluding that Plaintiff was not under a "disability" within the meaning of the Social Security Act and therefore was not eligible for SSI.  (Tr. 23-41).  The ALJ's decision and the resulting denial of benefits became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. # 12), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and granting her benefits.  At minimum, Plaintiff seeks a remand of this case to the Social Security Administration to correct certain claimed errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.  <u>Background</u>

### A.  **Plaintiff and her testimony**

Plaintiff was 47 years old at the time of the administrative decision, and thus was considered to be a "younger" person for purposes of resolving her SSI claim.  *See* 20 C.F.R. § 416.963(c); (*see* Tr. 40, 81).  She has a limited education, having completed only the 10th grade.  *See* 20 C.F.R. § 416.964(b)(3); (*see* Tr. 108).

2

Plaintiff has past relevant work experience as a cook, an industrial/commercial groundskeeper, and a cashier. (Tr. 115).

Plaintiff testified at the administrative hearing that she could not work because she had "multiple medical conditions." (Tr. 700). Her pulmonary impairment was the worst, as she had been diagnosed with COPD, asthma, and emphysema. (*Id.*). She continued to smoke one pack of cigarettes each day. (*Id.*). Plaintiff also testified that she had chronic chest wall pain. (Tr. 701). She underwent a "triple bypass" in 2000. (*Id.*). In addition, Plaintiff testified to suffering from "some mental/emotional issues," and "a lot of memory problems." (Tr. 702). She said that she suffered from depression. (Tr. 703-04).

Under examination by her attorney, Plaintiff stated that an automobile accident in 1997 caused her to experience residual effects, including chronic pain as well as vision, balance and memory problems. (Tr. 704-05).

### B.    Medical Record and Opinions

####    1.    *Physical Impairments*

#### Greene Memorial Hospital

On November 14, 2000, due to complaints of coughing and shortness of breath, Plaintiff underwent a chest x-ray that showed COPD and probable chronic bronchitis. (Tr. 155).

Complaints of chest pain led Plaintiff to undergo cardiac testing on November 30, 2000, revealing a normal ejection fraction of 71 percent and a normal rest/stress study. (Tr. 156). An exercise stress test was mildly positive for inferolateral ischemia and demonstrated poor exercise tolerance with development of severe claudication with exercise. (Tr. 157-58). On December 20, 2000, Plaintiff underwent coronary artery bypass grafting. (Tr. 163-65). Successive stress testing in February and June 2001 was negative for restricted blood flow to the heart (ischemia) and again showed a normal ejection fraction. (Tr. 209, 206). The June 2001 test showed poor exercise tolerance. (Tr. 206).

On October 30, 2001, Plaintiff presented to the emergency department due to acute exacerbation of COPD, mild congestive heart failure, and altered mental status, after she became lethargic and started slurring her speech while distributing Halloween candy. (Tr. 235-39). Plaintiff had experienced similar symptoms in the past from taking too much Soma (a muscle relaxant), although she denied taking any Soma at this time. (Tr. 237). Physical examination of the lungs revealed rhonchi in the left lung and diffuse expiratory wheezing and scattered coarse rales. (Tr. 238). Her breath sounds improved after she was given Lasix for pulmonary congestion. (*Id*.). She was discharged in good condition with a prescription for Vicodin, after stating that she was out. (*Id*.).

4

On March 20, 2002, Plaintiff presented to the emergency department due to a cough.  (Tr. 283-89).  The emergency department physician reviewed her prior medical records and noted that "she has had some mental status changes and lethargy" each time she was seen at the hospital.  (Tr. 285).  He observed that Plaintiff "actually seems to be clinically intoxicated with medications."  (*Id.*).  Her chest x-ray was suggestive of bronchitis and/or viral pneumonitis.  (Tr. 286).  An EKG showed sinus rhythm with nonspecific ST changes, but "no significant change" compared to previous EKGs.  (Tr. 285).  Arterial blood test results were abnormal.  (Tr. 288).  Plaintiff's husband reported that she was out of Klonopin, Vicodin, and Robaxin, but Plaintiff said that she no longer could return to her family physician due to an incident that occurred in that office.  (Tr. 285).  Plaintiff was diagnosed with and treated for exacerbation of COPD and bronchitis, and also given a three-day supply of her other medications.  (*Id.*).

On May 31, 2002, Plaintiff presented to the emergency department with chest pain.  (Tr. 309-19).  Discharge diagnoses were atypical chest pain; chest wall pain; coronary artery disease; hypokalumia; depression; tobacco abuse; COPD; and hypercholesterolemia.  (Tr. 313-14).  A chest x-ray showed mild underlying congestive changes, improved when compared to a March 20, 2002 study.  (Tr. 319).

5

On November 11, 2002, Plaintiff was sent from Dr. Saleem's office to the emergency department. (Tr. 320-32). Plaintiff was getting a stress thallium when she developed chest pain at her doctor's office. (Tr. 321). The pain was localized about three centimeters above her left breast. (*Id*.). An EKG obtained at Dr. Saleem's office showed some lateral ST depression likely to be ischemia. (*Id*.). Physical examination revealed marked tenderness of the left costal chondral margin when palpated with pressure. (*Id*.). Plaintiff was admitted for further evaluation to rule out a myocardial infarction. (Tr. 324). A chest x-ray showed slightly increased lung markings at the bases. (Tr. 327). Plaintiff was discharged from the hospital on November 13, 2002, after a heart attack was ruled out and her chest pain was controlled. (Tr. 326).

Plaintiff again was hospitalized from November 29, 2002 to November 30, 2002, after presenting with chest pain and anxiety. (Tr. 333-37). A chest x-ray showed basilar infiltrate, post-operative changes of the chest, and old apical granulomas on the right. (Tr. 336). Plaintiff was discharged from the hospital after an acute myocardial infarction was ruled out. (Tr. 337).

Plaintiff returned to the emergency department on September 28, 2004, due to chest pain. (Tr. 413-19). Physical examination showed bilateral expiratory wheezing and chest wall tenderness parasternally upon palpation. (Tr. 413). A

history and physical report dated September 29, 2004, indicates that Plaintiff was admitted when it was determined that a heart catheterization could not be performed until the following evening. (Tr. 415). That catheterization showed a normal left ventricle with an ejection fraction of 65 percent. (Tr. 487-88). Mid circumflex had 90 percent stenosis extending to the second OM (obtuse marginal branches of the circumflex coronary artery). (Tr. 487). The proximal RCA (right coronary artery) had 100 percent stenosis. (*Id.*). A 50 percent distal anastomosis lesion was noted in the graft anatomy. (*Id.*)

<u>Rajendra Patel, M.D.</u>

In March 2003, Dr. Patel, identified as one of Plaintiff's treating physicians, completed a form stating that Plaintiff's pulmonary condition was "stable" despite her continued smoking, and that she was "able to do normal activity." (Tr. 342-43). He also indicated that she "gets significant pain medicine" from a pain clinic. (Tr. 342).

A spirometry report dated May 10, 2003, showed her pre-bronch FVC was 73 percent, FEV was 60 percent, and DLCO (carbon monoxide diffusing capacity) was 45 percent. (Tr. 345-46). No significant bronchodilator response was noted. (Tr. 346). Test results suggested a moderate obstructive ventilatory deficit. (*Id.*).

<u>Damian M. Danopulos, M.D.</u>

On February 8, 2002, Dr. Danopulos performed pulmonary function testing on behalf of the Ohio Bureau of Disability Determination ["BDD"] (*see* Tr. 266-69), revealing "[m]ild degree [o]bstructive lung disease without [r]estrictive component." (Tr. 269). Another pulmonary function study performed on March 5, 2002, also on behalf of the Ohio BDD (*see* Tr. 278-79), showed a moderate obstructive lung defect and a severe decrease in diffusing capacity, suggesting emphysema and the presence of an obstructive lung defect. (Tr. 279).

Dr. Danopulos performed a limited cardiac examination on Plaintiff in April 2002, on behalf of the Ohio BDD. (Tr. 290-95). Exercise testing showed that Plaintiff experienced mild deprivation of oxygen (hypoxia), but her oxygen level immediately returned to normal after exercise. (Tr. 291). Dr. Danopulos found that Plaintiff was New York Heart Association [NYHA] functional class II, meaning mild and only slightly limiting of physical activity. (Tr. 294).

<u>Gary E. DeMuth, M.D.</u>

In May 2002, Dr. DeMuth reviewed Plaintiff's medical records on behalf of the Ohio BDD (*see* Tr. 255-62), and opined that Plaintiff was capable of medium work that did not involve concentrated exposure to fumes, odors, dusts, gases, or poor ventilation. (Tr. 256, 259). He specifically noted that Dr. Brunsman's

significantly differing assessment was "not supported by evidence in file." (Tr. 261).

<u>Stephen D. Watson, M.D., Ph.D.</u>

Plaintiff saw Dr. Watson, a consulting pain management specialist, in September 2002, although Dr. Watson noted that he was "not certain why she came" to see him. (Tr. 670). Plaintiff reported face and chest pain stemming from a 1997 motor vehicle accident in which she was thrown forward and hit her face. (*Id*.). Physical examination "was significant for a basically healthy appearing lady." (*Id*.). Dr. Watson noted tenderness over the left supraorbital nerve, infraorbital nerves, and greater occipital nerves bilaterally, along with decreased neck flexion. (*Id*.). Dr. Watson surmised that Plaintiff might have a complex regional pain syndrome ["CRPS"] on the left side of her face, versus a cervical facet syndrome or upper neck joint problem. (*Id*.). Plaintiff told him "that she was hurting so bad and was so emotional that she did not want treatment." (*Id*.). Plaintiff did ask for pain medication, and Dr. Watson "reluctant[ly]" gave her a prescription for Vicodin, but with no refills. (Tr. 671).

In November 2002, Dr. Watson reported that Plaintiff experienced partial but significant relief of her pain for three to four weeks after a prior stellate ganglion block. (Tr. 668). She reported continued twitching and throbbing in the

9

left side of her face that had started again recently. (*Id.*). Dr. Watson diagnosed CRPS of the face and administered an injection. (*Id.*). Plaintiff again asked for Vicodin, and Dr. Watson provided a prescription with one refill. (*Id.*).

In a teledictation report to the Ohio BDD in March 2003, Dr. Watson reported first seeing Plaintiff on September 16, 2002, for pain, throbbing, and swelling in her face. (Tr. 357). He felt that Plaintiff had a left facial synthetically maintained pain or CRPS. (*Id.*). He declined to opine whether or not Plaintiff was disabled. (*Id.*).

### Ahmed M. Saleem, M.D.

Plaintiff treated with Dr. Saleem, a cardiologist, from June 2001 to December 2002. (Tr. 195-211). On November 5, 2002, an echocardiogram revealed a normal ejection fraction of 58 percent and mild mitral valve prolapse with mild mitral regurgitation, diagnostic of Barlow's Syndrome. (Tr. 200). "Technically this is a good study." (*Id.*). When last seen, Dr. Saleem found Plaintiff to have "<u>no</u> restrictions from a cardiac standpoint." (Tr. 198) (emphasis in original).

### David A. Rath, M.D.

Dr. Rath reviewed the record on behalf of the Ohio BDD in April 2003. (Tr. 358-63). Dr. Rath found that Plaintiff was capable of medium work that involved

only occasional climbing of ladders, ropes or scaffolds; only occasional stooping

and crawling; and no concentrated exposure to fumes, odors, dusts, gases, or

poor ventilation.  (Tr. 359-61).  In December 2003, state agency reviewing

physician Maria P. Congbalay, M.D., affirmed Dr. Rath's opinion.  (Tr. 363).

<u>Bruce G. Hymon, M.D.</u>

Plaintiff first saw cardiologist Dr. Hymon during her September 2004

hospitalization.  (Tr. 412).  Dr. Hymon believed that medical therapy was

appropriate and scheduled Plaintiff in his office for regular cardiac follow-up.

(*Id.*).  On February 1, 2005, Dr. Hymon noted rhonchi present bilaterally and

slightly diminished breath sounds.  (Tr. 410).  He reported that Plaintiff had

chronic anxiety, which appeared to be severe.  (*Id.*).  On March 22, 2005, Dr.

Hymon found scattered rhonchi present.  (Tr. 408).  He noted that Plaintiff was

recently divorced and had been under "considerable stress" recently due to

problems with her 18-year-old son.  (*Id.*).  Dr. Hymon deemed Plaintiff's cardiac

condition "stable" and encouraged her to "remain physically active."  (*Id.*).

On July 26, 2005, Dr. Hymon completed a Cardiac Residual Functional

Capacity Questionnaire.  (Tr. 473-76).  Dr. Hymon reported Plaintiff's diagnosis

as ASHD (atherosclerotic heart disease) NYHA Class 3.  (Tr. 473).  He indicated

that Plaintiff's emotional difficulties (*i.e.*, "chronic anxiety") (*id.*) contributed to

her physical symptoms and limitations.  (Tr. 474).  Dr. Hymon felt that Plaintiff

was incapable of tolerating even "low stress" jobs.  (*Id.*).  Dr. Hymon stated that

Plaintiff's impairments were reasonably consistent with the symptoms and

functional limitations described in his evaluation.  (*Id.*).  He opined that Plaintiff

could sit less than two hours total in an eight hour working day, and could stand

or walk less than two hours total in an eight hour working day.  (Tr. 475).  Dr.

Hymon also opined that Plaintiff would need to take an unscheduled 30-minute

break every 30 minutes in an eight hour working day.  (*Id.*).  Dr. Hymon

indicated Plaintiff should avoid even moderate exposure to extreme cold,

extreme heat, or high humidity, and should avoid concentrated exposure to

wetness and cigarette smoke.  (Tr. 476).

### I.T. Hernandez, M.D.

In completing a pulmonary residual functional capacity questionnaire in

July 2005 (Tr. 645-48), Dr. Hernandez opined that Plaintiff was "completely

disable[d] for any kind of work" due to her cardiac conditions and severe chronic

obstructive lung disease.  (Tr. 647).  Dr. Hernandez indicated that Plaintiff should

avoid all exposure to environmental irritants (Tr. 648), and was incapable of

performing even low stress work.  (Tr. 646).

### David Witter, M.D.

12

In August 2005, Dr. Witter examined Plaintiff at the request of the Ohio BDD. (Tr. 432-39). Examination revealed left maxillary hyperesthesia. (Tr. 434). Anterior and posterior apprehension tests and Speed's tests were positive on the left. (*Id.*). Manual muscle testing strength was 4+/5 in the left shoulder abductor and 4/5 in the left shoulder external and internal rotators. (Tr. 436). Dr. Witter recorded strength of 4/5 in the wrist flexors and wrist extensors bilaterally. (*Id.*). He indicated, however, that such muscle testing was "not reliable" because pain related to rotator cuff and bilateral carpal tunnel syndrome inhibited testing. (*Id.*). Dr. Witter noted some reduced range of motion in the left shoulder. (Tr. 437). Sensory exam revealed decreased sensation in digits one to three bilaterally. (Tr. 434). Phalen's test was positive and abductor pollicis isolation tests were positive bilaterally. (*Id.*). Palpation of thoracic paraspinals, chest wall and particularly the costochondral joints revealed tenderness on the left side. (*Id.*). Dr. Witter diagnosed hyperesthesia of trigeminal nerve, hyperesthesia left chest with possible costochondritis, left rotator cuff syndrome, and bilateral CTS (carpal tunnel syndrome). (Tr. 435).

Dr. Witter opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 440). He said that fine control with Plaintiff's hands was limited due to pain, numbness, and/or weakness secondary to bilateral CTS,

and that overhead activity should be limited due to pain, numbness and weakness in her left rotator cuff.  (Tr. 441).  Dr. Witter also stated that reaching, fingering, and feeling were limited to occasional, and handling was limited to frequent.  (Tr. 442).  Dr. Witter concluded that Plaintiff "would be able to perform a job throughout a typical work day," although she should avoid jobs that involve heavy lifting or overhead activities.  (Tr. 435).

   2.    *Mental Impairment*

   TCN Behavioral Health Services ["TCN"]

   The record contains treatment notes from TCN dated from August 2001 until August 2005.  Plaintiff initially was evaluated by a therapist who diagnosed major depression and assigned Plaintiff a current Global Assessment of Functioning ["GAF"][2] score of 55.[3]  (Tr. 225-33).  Plaintiff began counseling and psychotherapy treatment.  (Tr. 489-644).

---

   [2]Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

   [3]A GAF of 55-60 refers to "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 ("DSM-IV-TR").

On September 17, 2001, Bobbie Fussichen, MSN, RNSS, initially assessed Plaintiff.  (Tr. 219-23).  On mental status examination, Ms. Fussichen noted that Plaintiff's mood was depressed.  (Tr. 222).  Ms. Fussichen stated that Plaintiff demonstrated decreased concentration and decreased short term memory.  (*Id.*).  On sensorium testing, Ms. Fussichen indicated that Plaintiff demonstrated decreased concentration recall.  (*Id.*).  Ms. Fussichen diagnosed major depression, recurrent.  (Tr. 223).  Ms. Fussichen noted that Plaintiff was taking more Klonopin than had been prescribed for her, so she was not to restart her Klonopin prescription.  (*Id.*).

Treatment notes from TCN document Plaintiff's missed therapy sessions on numerous occasions.  (Tr. 523, 524, 529, 530, 554, 558-59, 560, 567, 573, 580, 588, 604-05, 606, 621, 622, 626, 627, 630, 631-32, 637-38).  Plaintiff also occasionally continued to misuse her prescription medication.  (Tr. 581, 635).  Plaintiff admitted to prescription drug abuse.  (Tr. 490, 499-500, 589, 595, 635).

On May 10, 2002, Plaintiff underwent another diagnostic assessment.  (Tr. 212-218).  Plaintiff was diagnosed as opiate and sedative dependent.  (Tr. 217-18).  She was assigned a GAF score of 50.[4]  (Tr. 217).  Plaintiff was reported to be

---

[4]A GAF of 50 indicates "severe symptoms . . . or  serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *See* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 ("DSM-IV-TR").

taking larger amounts of pain medication than prescribed, and "spending more time w[ith] more doctors in order to get more pain medication." (Tr. 218).

Plaintiff was scheduled for court in February 2003 on a shoplifting charge. (Tr. 644). Treatment notes from April 2003 indicate that Plaintiff was incarcerated for the shoplifting charge and for violating her probation by incurring "another charge." (Tr. 603). An Adult Diagnostic Assessment form was completed on June 3, 2003, due to a referral from her probation officer for a drug/alcohol assessment. Plaintiff was diagnosed with opioid and sedative dependence, noting a history of prescription abuse with respect to the medication Klonopin. (Tr. 491-500). Plaintiff reported that her theft charges were related to her drug abuse. (Tr. 492).

Plaintiff was put back in jail in December 2003 after her parole was revoked for taking Klonopin that "she found," and she stole items from a garage sale where she was doing community service from her prior shoplifting conviction. (Tr. 539). Plaintiff was incarcerated again in March 2004 for a probation violation. (Tr. 531).

In August 2005, Ms. Fussichen and Franklin Halley, M.D., completed a mental impairment questionnaire. (Tr. 477-85). Ms. Fussichen and Dr. Halley provided a diagnosis of major depression and assigned a current GAF rating of

50 (with the highest GAF of the past year listed as 55).  (Tr. 477).  They indicated that Plaintiff's symptoms were "stable" and her prognosis "guarded."  (*Id.*).  They opined that Plaintiff was "[u]nable to meet competitive standards" of employment in 15 of 25 work-related mental categories.  (Tr. 479-80).  Plaintiff had "moderate" limitations in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, and pace.  (Tr. 480).  Ms. Fussichen and Dr. Halley also believed she had four or more episodes of decompensation in the previous year and would miss more than four workdays each month.  (Tr. 480, 482).

<u>Alan White, Ph.D.</u>

In December 2001, psychologist Dr. White examined Plaintiff at the request of the Ohio BDD.  (Tr. 246-53).  Plaintiff denied currently using alcohol, illicit drugs, or cigarettes.  (Tr. 247).  Plaintiff described her daily routine as getting her daughter off to school, performing light chores and household duties, helping her daughter, preparing dinner, and watching television.  (Tr. 248).  Her household duties included doing dishes, cleaning, doing laundry, and cooking.  (Tr. 249).  Plaintiff reported that she talked to her sister regularly, visited with her friends "often," and had current hobbies that involved crafts and sewing.  (Tr. 248).  Dr. White noted that Plaintiff was oriented, her affect was appropriate, and

17

her social skills were adequate. (Tr. 249). Dr. White diagnosed Plaintiff with dysthymic disorder and pain disorder associated with both psychological factors and general medical conditions. (Tr. 251). He assigned Plaintiff a GAF score of 55. (Tr. 252). Dr. White opined that Plaintiff had no impairment in her ability to remember, sustain, and concentrate, or in her ability to follow simple directions; mild impairment in her ability to get along with others; and moderate impairment in her ability to respond to job-related stress. (Tr. 252-53).

<u>Robelyn S. Marlow, Ph.D.</u>

On May 16, 2002, state agency psychologist Dr. Marlow reviewed Plaintiff's medical record (*see* Tr. 296-308), and opined that Plaintiff did not have a severe mental impairment. (Tr. 296). Dr. Marlow found that Plaintiff had only mild limitations in the mental functioning categories. (Tr. 306).

<u>Stephen R. Yerian, Psy.D.</u>

On June 14, 2003, Plaintiff was examined by Dr. Yerian, a clinical psychologist, on behalf of the Ohio BDD. (Tr. 364-70). Plaintiff presented with an observed dysphoric mood and her facial expression was predominantly sad. (Tr. 367). Dr. Yerian reported that Plaintiff's memory functioning seemed problematic during the mental status evaluation, as she could remember only one of three words after about five minutes on a brief memory task. (*Id.*). Dr. Yerian

18

diagnosed: 1) psychological factors (nicotine use/dependence, anxiousness) affecting a general medical condition (COPD, shortness of breath); 2) major depressive disorder, recurrent, severe, without psychotic features; 3) nicotine dependence; 4) anorexia nervosa, restricting type; 5) pain disorder associated with psychological factors (depression) and a general medical condition (s/p head and facial injuries/heart surgery/migraine headaches); and, 6) adult antisocial behavior. (Tr. 369). Dr. Yerian assigned Plaintiff a current GAF rating of 35.[5] (*Id.*). Dr. Yerian opined that Plaintiff's ability to relate to others was moderately impaired; her ability to maintain attention and concentration was moderately impaired; her ability to maintain pace and persistence was markedly impaired; and her ability to withstand the stress and pressures associated with day-to-day work was markedly impaired. (Tr. 369-70). She was able, however, to understand, remember, and follow simple, concrete instructions. (Tr. 369).

<u>Patricia S. Semmelman, Ph.D.</u>

State agency psychologist Dr. Semmelman reviewed the record in August 2003 (Tr. 387-89) and concluded that Plaintiff could interact "occasionally and superficially," and could receive instructions, ask questions appropriately, and

---

[5]In assigning Plaintiff a GAF of 35, Dr. Yerian noted that Plaintiff reported impairment in several areas of functioning due to depression and pain, including inability to sustain employment or to perform some routine tasks at home. However, he rated Plaintiff's functional severity at 62, "in the mild range," given her ability to maintain social relationships. (Tr. 369).

cope with "ordinary and routine" changes  in a smaller or more solitary work setting.  (Tr. 389).  Dr. Semmelman believed that Plaintiff was "at best partially credible," citing in part her denial of drug or alcohol use or dependence despite a record "replete with drug seeking" behavior.  (*Id.*).

In December 2003, Guy G. Melvin, Ph.D. reviewed the record and affirmed Dr. Semmelman's findings.  (Tr. 389).

###  C.  Medical Expert Testimony

Psychologist Mary Eileen Buban, Psy.D., summarized Plaintiff's mental health treatment records, based on her review.  (Tr. 707-15).  Dr. Buban noted Plaintiff's history of opiate/sedative misuse.  (Tr. 708, 710, 714, 715).  She also testified to Plaintiff's sporadic treatment history after being released from jail in November 2004.  (Tr. 716).  In Dr. Buban's opinion, Plaintiff's mental impairment did not meet the "B" criteria of Listing 12.04 or 12.06.  (Tr. 715, 717).  According to Dr. Buban, Plaintiff's depression was only mild to moderate and she had only infrequent anxiety attacks.  (Tr. 715).  Dr. Buban doubted that Plaintiff's mental impairment reduced her ability to relate to others, citing her performance of community service at a senior citizen center.  (Tr. 712, 717).  Dr. Buban opined that Plaintiff was capable of performing simple and detailed but not complex

tasks.  (Tr. 717-18).  She believed that Plaintiff should avoid production quotas because of her depression and anxiety complaints.  (Tr. 718).

### D.    Vocational Expert Testimony

Suman Srinivasan, the vocational expert ["VE"], was asked to assume a claimant with Plaintiff's vocational profile with the residual functional capacity for light exertion who would be limited to simple or jobs with simple or detailed in nature, no exposure to environmental pollutants, and no production quotas.  (Tr. 720-21).  In response, the VE testified that while Plaintiff's past relevant work would be ruled out, such a person could perform approximately 15,000 unskilled, light jobs in the regional economy, such as counter clerk or office helper, and 3,000 unskilled, sedentary jobs in the regional economy, such as addresser or pari-mutuel ticket checker.  (*Id.*).

## III.    THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.    Applicable Standards

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements.  Chief among these, for purposes of this case, is the "disability" requirement.  To receive SSI, an applicant must be a "disabled individual."  42 U.S.C. § 1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  The phrase "disabled individual," as defined by the Social

21

Security Act, has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70.  An SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

**B.     Social Security Regulations**

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 23-24); *see also* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?

2.     Does the claimant suffer from one or more severe impairments?

3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**C.    ALJ Shell's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 24, 2003, the date of her SSI application.  (Tr. 40).

The ALJ found at Step 2 that Plaintiff had the severe impairments of chronic obstructive pulmonary disease, history of coronary artery disease, anxiety disorder, and affective (depressive) disorder.  (*Id.*).  The ALJ determined at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the level of severity described in Appendix 1, Subpart P, Regulations No. 4.  (*Id.*).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform light exertional work, except that she was limited to no exposure to environmental pollutants and no work at heights.  (*Id.*).  The ALJ

determined that Plaintiff was mentally restricted to no complex tasks and no production quotas.  (*Id.*).  The ALJ next found that Plaintiff was unable to perform her past relevant work, but could have performed a significant number of jobs in the national economy.  (Tr. 40-41).  This assessment, along with his findings throughout his sequential evaluation, led the ALJ ultimately to conclude that Plaintiff was not under a disability, and hence not eligible for SSI.  (Tr. 41).

## IV.   JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at

407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's

legal criteria, may result in reversal even if the record contains substantial

evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Soc. Sec.*, 582

F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by

substantial evidence, 'a decision of the Commissioner will not be upheld where

the SSA fails to follow its own regulations and where that error prejudices a

claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*,

582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v.

Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    <u>The Parties' Contentions</u>

Plaintiff challenges the ALJ's RFC finding by arguing that the ALJ erred in

his assessment of several opinions in the record.  (Doc. # 7 at 17).  Specifically,

Plaintiff contends that the ALJ improperly gave reduced weight to certain

treating physician opinions, while giving too much weight to other opinions in

the record.  First, Plaintiff contends that the ALJ erred in rejecting the August

2005 opinion of Ms. Fussichen, a nurse practitioner, and Dr. Halley. (*Id.* at 18). Plaintiff argues that Ms. Fussichen's and Dr. Halley's opinion was supported by 156 pages of treatment notes, as well as by examining psychologist Dr. Yerian's opinion, which found that Plaintiff had moderate to marked limitations and a GAF score of 35. (*Id.* at 19-20). Plaintiff also challenges the ALJ's reliance on the opinions of Drs. White, Marlow, Semmelman, and the medical expert, Dr. Buban. (*Id.* at 18-19).

Turning to Plaintiff's physical impairments, Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Hymon, her cardiologist. (*Id.* at 20-21). Plaintiff further argues that the ALJ erred in rejecting Dr. Hernandez's opinion regarding Plaintiff's pulmonary impairment. (*Id.* at 21). Plaintiff contends that a pulmonary function study done in May 2005 documents listing-level pulmonary impairment, and presumably supports Dr. Hernandez's findings. (*Id.*).

Finally, Plaintiff contends that the ALJ erred by relying on an improper hypothetical to the vocational expert that does not constitute substantial evidence of Plaintiff's vocational abilities. (*Id.* at 21).

The Commissioner argues that the ALJ's RFC finding was reasonable and supported by substantial evidence, including numerous medical opinions, medical expert testimony, objective evidence, and treatment and examination

26

notes. (Doc. # 11 at 11). According to the Commissioner, the ALJ properly evaluated all opinion evidence in the record. (*Id.* at 15). The Commissioner also urges that Plaintiff's argument challenging the ALJ's hypothetical to the VE simply restates her invalid challenge to the ALJ's RFC finding. (*Id.* at 20).

**B. Medical Source Opinions**

1. *Treating Medical Sources*

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. (*Id.*).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a

whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406

(citing *Wilson*, 378 F.3d at 544).  More weight generally is given to the opinions of

examining medical sources than to the opinions of non-examining medical

sources.  *See* 20 C.F.R. §416.927(d)(1).  Yet the opinions of non-examining state

agency medical consultants have some value and can, under some circumstances,

be given significant weight.  *See infra.*

2.   *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act."  SSR 96-6p.  Yet the

Regulations do not permit an ALJ to automatically accept (or reject) the opinions

of a non-treating medical source.  *See id*. at **2-3.  The Regulations explain, "In

deciding whether you are disabled, we will always consider the medical opinions

in your case record together with the rest of the relevant evidence we receive."

20 C.F.R. § 416.927(b).  To fulfill this promise, the Regulations require ALJs to

evaluate non-treating medical source opinions under the factors set forth in

§416.927(d) including, at a minium, the factors of supportability, consistency, and

specialization.  *See* 20 C.F.R. § 416.972(f); *see also* SSR 96-6p at **2-3.

**C.**   **Discussion**

A review of the ALJ's decision reveals a well-supported description of the medical source opinions and records.  (Tr. 25-30).  Contrary to Plaintiff's contentions, the ALJ provided sufficient information to show that he weighed these medical source opinions as the Regulations require.  The ALJ correctly set out the legal criteria applicable under the treating physician rule and correctly recognized that if controlling weight is not due a treating physician's opinion under that criteria, the Regulations require him to continue weighing the treating physician's opinions under a number of factors.  (*See* Tr. 30-31).  The ALJ then correctly listed those factors consistent with the Regulations and case law.  *(See* Tr. 31); *see also* 20 C.F.R. § 416.927(d)(2)-(6); *Wilson*, 378 F.3d at 544.

### 1.   *Mental Limitations*

In addressing Plaintiff's mental residual functional capacity, Plaintiff contends that the ALJ erred in accepting the opinions of Drs. White, Marlow, Semmelman, and the medical expert, Dr. Buban.  (Doc. #7 at 18-19).  In a related argument, Plaintiff contends that the ALJ erred by failing to give controlling weight to Plaintiff's treatment providers at TCN.

In this case, the ALJ expressly referenced the applicable factors set forth at 20 CFR § 416.927.  (*See* Tr. 32).  In considering the August 2005 opinion of Ms. Fussichen, a nurse practitioner, and Dr. Halley, he stated:

> A treating mental health professional submitted a form entitled "Mental Impairment Questionnaire (RFC & Listings)" dated August 8, 2005.  The claimant's mental impairment was characterized as major depression.  Her condition was described as stable.  Her prognosis was described as guarded.  It was reported that the effects of mental impairment were "serious" to the extent that the claimant would be "unable to meet competitive standards" in mental functioning.  Specific areas of mental functioning (ability to do activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace) were described as "moderately" limited.  It was indicated that the claimant has "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."  The degree of limitation described by this treating source is not substantiated by the weight of the evidence and cannot be considered credible when evaluated under the guidelines of 20 CFR 416.927.

(Tr. 31-32) (citations to record omitted).  Although that direct discussion of the TCN opinion is relatively brief, this Court nonetheless concludes that the ALJ's evaluation of the disability opinions of Ms. Fussichen and Dr.  Halley, viewed in the context of his decision as a whole, satisfies the requirements of the regulations, *Blakley* and *Wilson*.

In evaluating Plaintiff's limitations associated with her mental impairment, the ALJ reasonably concluded that Plaintiff had not established by substantial evidence that she was more than mildly restricted in her ability to perform

30

activities of daily living.  (Tr. 33).  He noted that Plaintiff reported to Dr. White that she typically helped her daughter get ready for school each day.  (Tr. 33, 37; *see* Tr. 248).  He also remarked on Plaintiff's own reported ability to do light household chores, prepare meals, and watch television.  (*Id.*; *see* Tr. 248-49).  The ALJ further noted that Plaintiff confirmed to Dr. White that she was able to attend to her own personal hygiene and grooming (*id.*), talk by telephone to her sister (*id.*), visit with friends (*id.*), and engage in hobbies, including crafts and sewing.  (*Id.*).  Additionally, the ALJ noted that even Dr. Yerian reported that Plaintiff's overall judgment seemed "unimpaired."  (Tr. 33; *see* Tr. 368).  Dr. Yerian also felt that Plaintiff had the mental ability to manage her own finances (*id.*; *see* Tr. 370), and he, too, reported that she tended to her own personal grooming and hygiene, did household chores, watched television, and engaged in crafts and sewing as hobbies.  (*Id.*; *see* Tr. 368).  Moreover, the ALJ observed that both Dr. Marlow and Dr. Semmelman opined that Plaintiff experienced no more than "mild" limitation in her ability to do activities of daily living.  (*Id.*; *see* Tr. 306, 384).  The ALJ's finding to that effect thus was supported by substantial evidence.

The ALJ also reasonably found that Plaintiff had no more than a "mild" degree of limitation in her ability to maintain social functioning.  (Tr. 33).  He

noted Dr. Marlow's express conclusion to that effect. (*Id., see* Tr. 306). He also again cited Dr. White's report of Plaintiff regularly talking by telephone to her sister and visiting with friends. (*Id., see* Tr. 248-49). The ALJ remarked on Dr. White's description of Plaintiff as friendly and amiable, with adequate social skills. (*Id.; see* Tr. 249). Finally, he noted medical expert Dr. Buban's conclusion that Plaintiff had no documented problems relating adequately to other people (*id.; see* Tr. 712, 717), and indeed, had "enjoyed [her] work at the senior citizens center." (Tr. 717). Substantial evidence supported those findings.

Additionally, the ALJ reasonably found that Plaintiff's ability to maintain concentration, persistence, or pace was only moderately limited. (Tr. 33-34). He noted that Dr. White had concluded that Plaintiff's abilities to remember, sustain, concentrate, attend, and follow simple instructions were not impaired. (Tr. 33; *see* Tr. 252). Relying on Dr. Semmelman's conclusions, the ALJ further found that Plaintiff's ability to cope with work-related stress was only moderately impaired. (*Id.; see* Tr. 389). He cited Dr. Buban's testimony that Plaintiff was able to maintain sufficient concentration, persistence, and pace to understand, remember, and carry our simple tasks. (*Id.; see* Tr. 717-18). The ALJ also relied on Dr. Buban's opinion as a basis for limiting Plaintiff to jobs that would not involve production quotas, acknowledging that such high-stress jobs might aggravate

Plaintiff's anxiety.  (*Id.*; *see* Tr. 718).  Lastly, the ALJ determined that the record did not contain substantial evidence of repeated episodes of decompensation of extended duration.  (Tr. 34).

In light of the foregoing analysis, substantial evidence supports all aspects of the ALJ's finding that Plaintiff's mental impairments did not meet or equal Listing 12.04 or 12.06.  Because the ALJ explicitly noted inconsistencies between the TNC mental health providers' opinion and those of other medical sources, the ALJ properly declined to give the TNC opinion controlling weight.  *See Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544.  Notably, given that the medical sources on whose opinions the ALJ relied (*i.e.*, Dr. Buban, Dr. White, Dr. Marlow, and Dr. Semmelman) were psychologists specializing in the field of mental health, Dr. Halley's area of specialization is <u>not</u> a factor that favors his opinion over those others.  Also significant is the fact that Plaintiff's treatment relationship with the TCN providers was marked by an extensive list of missed therapy sessions (*see* Tr. 523, 524, 529, 530, 554, 558-59, 560, 567, 573, 580, 588, 604-05, 606, 621, 622, 626, 627, 630, 631-32, 637-38), and some credibility issues.  As a result, and given the substantial contrary record evidence outlined *supra*, the ALJ did not err by refusing to defer to the August 2005 disability opinion of Nurse Fussichen and Dr. Halley.  (*See* Tr. 477-85).

### 2.    *Physical Limitations*

Regarding Plaintiff's physical impairments, the ALJ reasonably relied on the opinion of the examining physician, Dr. Witter, and the corroborating opinions of the reviewing physicians, Drs. DeMuth and Rath.  (*See* Tr. 26-27, 31, 35-36).  Aside from noting Dr. Watson's characterization of Plaintiff as a "basically healthy appearing lady" (Tr. 26, 35; *see* Tr. 670), the ALJ also specifically found that Plaintiff's cardiac and pulmonary impairments had been described as "stable." (Tr. 25; *see* Tr. 342-43, 408).  Plaintiff's relatively benign diagnostic test results as reported in the record support that finding.  For example, while pulmonary function reports show that Plaintiff had a "mild" to "moderate" obstructive lung defect, in March 2003, Plaintiff's treating physician, Dr. Patel, reported that Plaintiff was able to do normal activity and that her pulmonary impairment caused no physical limitations.  (Tr. 342-43).  In addition, cardiac testing consistently revealed that Plaintiff's ejection fraction was at normal levels.  (Tr. 156, 200, 487).  The ALJ found significant that in November 2002, Dr. Saleem, Plaintiff's then treating cardiologist, opined that Plaintiff had "no restrictions from a cardiac standpoint."  (Tr. 31; *see* Tr. 198).  Finally, the ALJ also relied on Plaintiff's daily activities in finding that she was capable of at least a reduced range of light work.  (Tr. 37).

34

In rejecting Dr. Hymon's opinion, the ALJ found that opinion to be both unsupported by substantial evidence and based on uncritical acceptance of Plaintiff's subjective complaints and allegations. (Tr. 31). The Regulations specifically authorize ALJ Shell to weigh Dr. Hymon's opinions based on the extent to which they are well explained and consistent with the record as a whole. *See* 20 C.F.R. § 416.927(d)(2)(4). A review of the form Dr. Hymon completed in July 2006 confirms the reasonableness of ALJ Shell's dim view of that opinion, given Dr. Hymon's indication that Plaintiff did <u>not</u> have "marked limitation of physical activity," yet placing extremely severe physical restrictions on her ability to work. (Tr. 31; *see* Tr. 473, 475). In addition, the ALJ noted that clinical test results tend to undermine Dr. Hymon's extreme degree of limitation. (Tr. 31); *see* 20 C.F.R. § 416.927(d)(3). For example, Plaintiff's ejection fraction measurements always were well within the normal range and do not suggest any abnormalities in cardiac functioning. (*See* Tr. 156, 200, 487). Also, Dr. Danopulos found that Plaintiff was New York Heart Association [NYHA] functional class II, indicative of only mild limitations. (*See* Tr. 294). Moreover, despite Dr. Hymon's status as Plaintiff's treating cardiologist, his opinion was contradicted by that Dr. Saleem, another cardiologist who treated Plaintiff's cardiac condition prior to Dr. Hymon. As noted above, Dr. Saleem found "no restrictions from a cardiac

standpoint." (Tr. 31; *see* Tr. 198). As such, Dr. Hymon's specialization is not a significant factor for purposes of assigning weight to his opinion. Substantial evidence thus supports the ALJ's stated reasons for failing to credit Dr. Hymon's extreme opinion.

Plaintiff further contends that the ALJ erred by failing to evaluate Dr. Hernandez's opinion using the factors set forth in the regulations. (Doc. #7 at 21). Acknowledging that Dr. Hernandez deemed Plaintiff to be "completely disabled for any kind of work" (*see* Tr. 647), the ALJ nonetheless refused to accept that conclusion, finding that Dr. Hernandez's opinions were "not substantiated by the weight of the evidence." (Tr. 32; *see* 20 C.F.R. § 416.927(d)(2)-(4)). Having concluded that Dr. Hernandez's opinion was not well supported by medically acceptable data, the ALJ was not required to give that opinion controlling weight under the treating physician rule. *See Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. This Court's review confirms the reasonableness of the ALJ's decision to that effect. In the first instance, the ALJ specifically noted that Plaintiff's medical records showed Plaintiff's pulmonary condition to be relatively stable. (Tr. 32). For example, pulmonary function testing in February and March 2003 revealed a "mild" to "moderate" obstructive lung defect. (*See* Tr. 269, 279). In addition, Dr. Patel found in March 2003 that Plaintiff's pulmonary

condition was "stable," allowing her "to do normal activity." (Tr. 342-43). Although Plaintiff argues that a pulmonary function study done in May 2005 documents listing-level pulmonary impairment and supports Dr. Hernandez's findings, she does not explain <u>how</u> this test supposedly establishes a "listing-level pulmonary impairment," or how it supports Dr. Hernandez's opinion. (*See* Doc. #7 at 21). That test's results reveal that Plaintiff had some difficulty performing some test maneuvers, particularly the DLCO test. (Tr. 425). But Defendant argues persuasively that even if that test does tend to support Dr. Hernandez's extreme opinion, it is only one test, and fails to establish a long-term, severe pulmonary impairment. (Doc. #11 at 20). This Court agrees. Substantial evidence supports the ALJ's rejection of Dr. Hernandez's opinion.

Lastly, although Plaintiff contends that substantial evidence in the record as a whole supports the opinions of Drs. Hymon and Hernandez, the existence of evidence contrary to the ALJ's findings does not negate the substantial evidence supporting those findings. *See Her*, 203 F.3d at 389-90 ("Even if the evidence could also support another conclusion, the decision of the ALJ must stand if the evidence could reasonably support the conclusion reached"). Because a reasonable mind might accept the above-discussed relevant evidence as adequate

37

to support the ALJ's findings, and because the ALJ applied the correct legal

criteria, his decision must be affirmed.  *See Rabbers*, 582 F.3d at 651.

        *3.*    *Vocational Analysis*

Finally, in challenging the propriety of the hypothetical question posed to

the vocation expert, Plaintiff contends that "[t]he ALJ failed to include limitations

that would account for the marked difficulties maintaining concentration,

persistence and pace and handling stress associated with day-to-day work

activities documented by the treating sources at TCN and Dr. Yerian."  (Doc. #7

at 22).  Because the ALJ appropriately declined, for the reasons stated *supra*, to

impose further restrictions, based on the evidence that he found to be credible,

Plaintiff's suggestion that the hypothetical question posed by the ALJ did not

adequately account for her mental limitations is not well taken.

However, Plaintiff also continues as follows:

> Further, the ALJ failed to include any of the
> manipulative limitations supported by the consultative
> examination report of Dr. Witter.  Finally, substantial
> evidence of record supports the opinion of the providers
> at TCN that Ms. Applegate would miss more than 4
> days of work each month as a result of her impairments
> or treatment.

(Doc. #7 at 22).

This contention, too, lacks merit, because Plaintiff has not shown that the ALJ's assessment of her RFC was based on legal error or was unsupported by substantial evidence.  ALJ Shell acknowledged Dr. Witter's notation regarding a limitation on Plaintiff's ability to use her hands for fine control (*see* Tr. 26), but reasonably found that "[t]here is no substantial evidence to show that [Plaintiff] lacks the functional capacity to use her upper extremities for fine or gross manipulation." (Tr. 27).  Indeed, Plaintiff herself points to no other evidence in the record to support such a restriction. (*See* Doc. #7).  Similarly, as the ALJ did not find credible Plaintiff's mental health care providers' dire predictions regarding Plaintiff's frequent absenteeism, the ALJ also did not err by omitting such restrictions from his question to the VE.  As a result, the VE's testimony about a hypothetical person with the stated limitations and abilities, which incorporated the ALJ's residual functional capacity (*see* Tr. 720-21), constituted substantial evidence to support the ALJ's conclusion at Step 5 of the sequential analysis.  *See Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert.")).

Accordingly, Plaintiff's Statement of Errors lacks merit.

**IT THEREFORE IS RECOMMENDED THAT:**

1.      The Commissioner's final determination be AFFIRMED; and

2.      This matter be TERMINATED on the docket of this Court.


July 26, 2011                                             s/ Sharon L. Ovington    
                                                                    Sharon L. Ovington
                                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).